

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JJD:PGS/JLG/MEF
F. #2016R01021

*610 Federal Plaza*
*Central Islip, New York 11722*

January 11, 2024

By ECF

The Honorable Gary R. Brown
United States District Judge
United States District Court
940 Federal Plaza
Central Islip, New York 11722

   Re: United States v. Reynaldo Lopez-Alvarado
     Criminal Docket No. 16-403 (S-7)(GRB)

Dear Judge Brown:

  On September 15, 2022, the defendant Reynaldo Lopez-Alvarado, also known as "Mente," a member of La Mara Salvatrucha, also known as the MS-13, a transnational criminal organization, pleaded guilty to Count One, charging Racketeering, in violation of 18 U.S.C. § 1962(c), including racketeering acts charged in connection with the April 9, 2013 attempted murder of John Doe #2 (Racketeering Act 2B); a May 2013 conspiracy to commit obstruction of justice (Racketeering Act 5A); a January 2013 to December 2016 conspiracy to distribute cocaine and marijuana (Racketeering Act 6); and the November 19, 2015 murder of Cesar Rivera-Vasquez (Racketeering Act 8B). The defendant is scheduled to be sentenced on January 17, 2024.

  According to the Probation Department, the defendant's total offense level is 40, and he should be sentenced within Criminal History Category III, which yields an advisory Guidelines sentence of 360 months to life in prison. Pre-Sentence Investigation Report ("PSR") at ¶ 176. The total offense level set forth in both the PSR and the plea agreement between the government and the defendant are the same. However, the PSR calculated the defendant's criminal history prior to the changes to the Guidelines that went into effect on November 1, 2023. Based on the recent amendments to the Guidelines, the previously applicable 2-point enhancement under to § 4A1.1(d) no longer applies in this case. Accordingly, the defendant should be sentenced within Criminal History Category II, which, together with a total offense of level of 40, results in an advisory Guidelines range of 324 to 405 months' imprisonment – the same range set forth in the plea agreement.

On December 27, 2023, the defendant submitted a sentencing memorandum ("Def. Mem.") wherein he requested a sentence of 24 years. Def. Mem. at 9. For the reasons set forth below, the government respectfully submits that, after considering the factors set forth in 18 U.S.C. § 3553(a), in particular, the seriousness of the offense conduct, the need for deterrence, and the need to provide a just punishment for the defendant's crimes, the Court should sentence the defendant to 33 years in prison, which is within the stipulated Guidelines calculation set forth in the plea agreement.

**I.   Background**

The defendant's arrest and conviction resulted from an investigation by the Federal Bureau of Investigation's Long Island Gang Task Force (the "Task Force") into a series of violent crimes committed by members of the MS-13 street gang. The defendant, who is a self-admitted member of the Brentwood Locos Salvatruchas ("BLS") clique of the MS-13, and dozens of other MS-13 gang members have been charged and convicted in a series of indictments with a litany of violent crimes, including 18 murders and numerous attempted murders and assaults in this case.

A.   April 9, 2013 Attempted Murder of John Doe #2 (PSR at ¶ 15)

In early 2013, the defendant was an associate of the BLS clique of the MS-13 and was seeking to elevate his status in the gang by committing acts of violence against rival gang members. On April 9, 2013, the defendant and another MS-13 member were driving on Benton Place in Bay Shore, New York, when they saw a group of African American males who they believed were members of the rival Bloods street gang. The defendant and the other MS-13 member agreed to attack and try to kill members of the group of suspected rivals. The defendant, who was driving, returned to his house with the other gang member where they retrieved a 20-gauge shotgun and .25 caliber handgun. They then returned to the vicinity of Benton Place and the defendant parked the car close to the group of males. The defendant and the other MS-13 member got out of the car, both armed with one of the weapons, approached the group and each opened fire multiple times before running back to the car and fleeing the area. John Doe #2 was struck in the left arm and transported to a local hospital. He survived but had to undergo surgery to treat his injury.

B.   May 2013 Conspiracy to Obstruct Justice (PSR¶¶ 16-19)

In the Spring of 2013, BLS members who, like the defendant, were seeking to elevate their status in the gang participated in two murders during Memorial Day weekend 2013. On May 26, 2013, two MS-13 members shot and killed Derrick Mayes after they saw him walking on Wilson Boulevard in Central Islip and suspected that he was a rival. The following evening, just after midnight on May 28, 2013, MS-13 members attacked a group of individuals leaving a house party on Acorn Avenue in Central Islip, that the MS-13 members believed was the home of a Bloods gang member. Several armed MS-13 members approached the individuals and opened fire. Keenan Russell was struck multiple times and died of his wounds. MS-13 members used a Ford Windstar minivan that one of them had

recently stolen in both murders (the "Minivan"). After fleeing the Russell murder, the Minivan ran out of gas and the MS-13 members called the defendant for assistance. The defendant drove to their location and then took them to a nearby gas station to purchase gasoline for the Minivan. After refueling the Minivan, the defendant and the other gang members drove to the defendant's home where they left the weapons used in the murders for safe keeping.

In the days following the Mayes and Russell murders, one of the participants in the murders learned that information was circulating on social media that the Minivan was seen leaving the scene of one or both murders. The defendant agreed to help the other BLS clique members to destroy the minivan so it could not be located and linked to them in connection with the murders. On May 30, 2013, they drove the Minivan to a wooded area in Ronkonkoma adjacent to an apartment building where one of the other gang members lived. The inside of the Minivan was wiped down to clean it of any fingerprints before being doused with gasoline and set on fire. The local fire department and Suffolk County Police Department ("SCPD") responded and subsequent investigation determined that the minivan had been destroyed by arson started by gasoline.

C.   November 19, 2015 Murder of Cesar Rivera-Vasquez (PSR ¶ 27-28)

On November 20, 2015, Cesar Rivera-Vasquez was reported missing to the SCPD by a family member who last reported him seen on November 18, 2015. Initial investigation of the report determined that the victim left a deli in Babylon (the "Deli") close to midnight on November 18, and got into a white sedan with two other men, one of whom was the defendant.

Further investigation determined that the victim was killed by five members of the MS-13, including the defendant, Jhonny Contreras, also known as "Muerte," "Reaper" and "Conejo," and Jeffrey Amador, also known as "Cruel." The victim was targeted because the defendant and his fellow gang members suspected Rivera-Vasquez of being a member of the rival gang Raza Loca. On the night of the murder, the defendant and Contreras encountered the victim at the Deli. Contreras started speaking to the victim, who was intoxicated. During their conversation, the victim told Contreras that he was a member of Raza Loca. Thereafter, Contreras told the defendant that the victim was a rival and they contacted other MS-13 members, including Amador, and began to form a plan to kill Rivera-Vasquez. The defendant convinced the victim to leave with them by promising to sell him cocaine. The victim left the Deli with the defendant, Contreras and another MS-13 member. They drove the victim a short distance to a secluded area behind a baseball field where they were met by Amador and another gang member. The MS-13 members were armed with a baseball bat and knives. The MS-13 members surrounded the victim, and the defendant told the victim to take off his shirt so they could look at his tattoos. After seeing a tattoo that demonstrated his membership in the rival gang, Contreras struck the victim with the baseball bat and the other gang members began stabbing him repeatedly with knives. Despite his injuries, the victim did not succumb to the ongoing attack until the defendant took a knife

3

and cut his throat. Once he was dead, the MS-13 members buried the victim's body near a large mound of dirt where it was later discovered by the Task Force in April 2018.

  D. BLS Narcotics Distribution Conspiracy (PSR ¶ 63)

  Finally, from January 2013 to December 2016, the defendant and his fellow BLS members agreed to sell and did sell cocaine and marijuana to raise money for the clique. The profits from the drug sales were used to purchase firearms, ammunition, and other weapons and to send money to leaders in El Salvador.

  E. The Defendant's Arrest

  The defendant was arrested on taken into federal custody and charged in the instant case on July 25, 2016, after being transferred from a state correctional facility in Yaphank, New York, where he was being held in connection with pending state charges. PSR at ¶ 68.

## II. The Defendant Should be Sentenced to 33 Years in Prison

  For the reasons set forth below, the government respectfully submits that the defendant should be sentenced to 33 years in prison.

  A. Legal Standard

  In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines were no longer mandatory, but should be considered in conjunction with the factors outlined in § 3553(a). Thereafter, the Supreme Court confirmed that § 3553(a) requires a sentencing court to give respectful consideration to the Guidelines, but Booker allows the court to "tailor the sentence in light of other statutory concerns[.]" Kimbrough v. United States, 552 U.S. 85, 101 (2007) (citing Booker at 245-46 and Gall v. United States, 552 U.S. 38, 46-49 (2007)). However, the Supreme Court explained that even though the Guidelines are now advisory, "district courts must treat the Guidelines as the 'starting point and the initial benchmark'" when determining a defendant's sentence. Kimbrough at 108 (citing Gall at 50 and Rita v. United States, 168 L. Ed. 203, 213 (2007)).

  With the Guidelines as the "starting point and the initial benchmark," the Court should next consider the factors set forth by Congress in § 3553(a). Id. That statute provides that a Court should consider a number of factors when determining a defendant's sentence, including:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and
>
> (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to

4

> protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. §§ 3553(a)(1) and (2).

B.  Analysis

Here, pursuant to the recent decisions of the Supreme Court, the Court's "starting point and the initial benchmark" should be the advisory Guidelines range of 324 to 405 months' imprisonment. Kimbrough at 108 (citing Gall at 50 and Rita v. United States, 168 L. Ed. 203, 213 (2007)). In light of the sentencing factors set forth by Congress in § 3553(a), the government respectfully submits that the defendant should be sentenced to 33 years in prison.

As an initial matter, with respect to § 3553(a)(1), the seriousness of the defendant's conduct cannot be overstated and weighs heavily in favor of a significant sentence in this case. For years, the defendant faithfully carried out the violent and depraved mission of the MS-13, committing vicious and senseless acts of violence, including the attempted murder shooting of John Doe #2 and the Rivera-Vasquez murder. The Rivera-Vasquez murder, like many MS-13 killings, was noteworthy for its brutality and complete indifference to human suffering. The defendant and his fellow gang members did more than just kill the victim, they terrorized him, tortured him, and when he didn't succumb to his injuries after being stabbed repeatedly, the defendant took a knife and cut his throat. Furthermore, the defendant's attack on a group of African American males in April 2013, demonstrated the type of random and unprovoked violence committed by the MS-13 in residential communities like Central Islip, which have been plagued by indiscriminate shootings and acts of violence at the hands of the MS-13 for years. The defendant further demonstrated his steadfast commitment to the gang by assisting his fellow gang members after the Mayes and Russell murders to help them avoid prosecution, and by years spent dealing narcotics and raising money to fund the gang's criminal activities. Indeed, the defendant's conduct is made even more serious because it was done in furtherance of the MS-13's mission to terrorize whole communities through its criminal activities, which essentially amounts to committing violence for the sake of violence. Accordingly, the nature and circumstances of the offense conduct warrants a severe sentence in this case.

Furthermore, when determining an appropriate sentence, due consideration must be given to the consequences of the defendant's actions, particularly for the victims' families. Although the government has had limited contact with the Rivera-Vasquez family during the pendency of this case, the loss of a loved one is always traumatic, and a significant sentence has to address the lifetime of suffering for the friends and family members. Additionally, while the defendant did not cause their deaths, he assisted those who murdered Mayes and Russell. Notably, both families have been to each of the defendant's in-person court conferences, without exception. The loss of their loved ones has had a devastating effect on each family, yet they have demonstrated unwavering devotion to their

5

loved ones and commitment to seeing the legal process through to the end. The sentence here should also take into account the further suffering caused by this defendant to those families by destroying evidence and obstructing justice in connection with the Mayes and Russell murders.

The defendant's history and characteristics also weigh in favor of a significant prison sentence. In addition to his membership in the MS-13 for more than three years, and his violent acts resulting in the instant conviction, the defendant's history of violence goes as far back as April 2012 when he attacked someone with a knife. PSR ¶ 115. The victim sustained a deep laceration to his left arm, a puncture wound to his abdomen and a laceration to his face, requiring hospitalization. Id. The defendant was charged in state court, pleaded guilty to felony attempted assault in the second degree and was sentenced to 16 months to 4 years in prison. Id. Notably, the defendant committed the attempted murder of John Doe #2 while out on bail in connection with the state assault case. The fact that, despite his pending case, the potential for a lengthy prison sentence, and being under the supervision of the state court, the defendant was undeterred from continuing to engage in violent crimes further illustrates his unrelenting appetite for violence and disregard for the law and judicial authority. Nor did the defendant's lengthy state prison sentence deter him from continuing down this destructive path. To the contrary, once back on the street, the defendant re-committed himself to the gang and became even more violent and dangerous, as demonstrated by the Rivera-Vasquez murder.

The defendant has had several disciplinary infractions during his incarceration at the Metropolitan Detention Center ("MDC"), further demonstrating his violent, disruptive, and defiant nature. On January 12, 2021, the defendant was involved in a fight between several MS-13 members on his unit, regarding an internal gang dispute. He was sanctioned with the loss of 27 days of good conduct time credit and a loss of 90 days of commissary privileges. On February 11, 2020, the defendant provided a urine sample that tested positive for Buprenorphine, a synthetic opioid. He was sanctioned to 30 days of disciplinary segregation and 90 days loss of email and music player privileges. On October 26, 2018, the defendant was found in possession of a hazardous tool and was sanctioned to 45 days of disciplinary segregation. Finally, on July 18, 2018, the defendant was found in possession of contraband, specifically, a USB cell phone charger. The defendant admitted to possessing the illicit item and was sanctioned to 15 days of disciplinary segregation and loss of phone privileges for 180 days.

The defendant raises several arguments related to his background in advocating for a below-Guidelines sentence of 24 years' imprisonment. First, the defendant cites to his difficult upbringing once he immigrated to the United States from El Salvador. Specifically, the defendant asserts, inter alia, that his mother provided no emotional support and that he had no positive adult role models once he moved to Long Island. See Def. Mem. Ex. A at 12-13. He claims that he gravitated to the gang because it gave him a "semblance of a family," having felt neglected by his mother at home, and after being exposed to fear, intimidation and pressure from gangs at school. Def. Mem. Ex. A at 8, 13. With regard to the defendant's childhood, it should be noted that, although he lived in poverty in El

Salvador before coming to the United States, the defendant reported a "happy and humble upbringing" and was raised by loving family members there. Def. Mem. Ex. A at 4. And while the defendant's background is certainly something the Court can consider when determining a proper sentence, the difficult circumstances he experienced after immigrating to this country are, unfortunately, not unique. Indeed, there are countless immigrants born in impoverished countries who come to the United States seeking a better life, experience hardships once they arrive and do not join violent street gangs or commit murder. Additionally, while his estranged relationship with his mother and difficulties at school may have contributed to his initial attraction to the gang, the defendant made the conscious decision to develop relationships with MS-13 members, join the gang and commit horrific acts of violence. Moreover, and contrary to the defendant's claim, the overwhelming majority of similarly situated Central American immigrants who face the same pressures to join a gang, choose to reject them in favor of making a better life for themselves and their families, rather than to embrace a life of crime, like the defendant. Furthermore, unlike many young people who come to the United States when they are older and often fall behind in middle and high school while struggling to learn English, the defendant came here at 8 years-old, learned English at a young age and performed well in school, receiving praise from various educators for his intelligence. See Def. Mem. Ex. A at 10. Despite that advantage over other, older immigrant children, the defendant squandered his opportunity to have a productive and law-abiding life in favor of a life committed to violence, which is the commitment made by all MS-13 members.

   The defendant further asserts that an alcohol and drug addiction brought on by depression further led to his involvement with the gang, claiming that "[u]nder the influence, [the defendant] gravitated to MS-13," but that he was a different person when sober – a "family man." Def. Mem at 2. The defendant joined and was a devoted member of the most violent street gang in the United States and committed acts of violence, including a gruesome murder, that cannot be explained away by depression, drugs, or alcohol use. Furthermore, the defendant was a longtime member of the gang and had plenty of sober moments to reflect on his involvement with the MS-13. The decision to be part of an organization devoted to violence and murder was his and he made it every day for more than three years.

   Thus, the "nature and characteristics of the offense" and the "history and characteristics" of the defendant warrant a sentence of 33 years in prison, pursuant to § 3553(a)(1).

   The Court must also consider the factors set forth in § 3553(a)(2)(A)-(C), which provide that a sentence should reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(A)-(C). These factors also weigh in favor of a significant sentence.

   First, with respect to factor § 3553(a)(2)(A), for the reasons set forth above, the attempted murder of John Doe #2 and the Rivera-Vasquez murder are extremely serious offenses and need to be adjudicated in a manner that will promote respect for the law and provide just punishment for the offenses. As previously stated, the offenses are more serious

because they were committed in furtherance of the MS-13 racketeering enterprise by the defendant and other members and associates of the BLS clique.

Second, in regard to factor § 3553(a)(2)(B), affording adequate deterrence to criminal conduct, Long Island has been plagued by gang violence for well over a decade. In the instant indictment alone, MS-13 members were indicted on charges relating to 18 murders between May 2013 and April 2017, and numerous other violent crimes. A 33-year prison sentence would send a strong message that violent conduct such as that engaged in by the defendant and his fellow MS-13 gang members will not be tolerated.

Third, pursuant to § 3553(a)(2)(C), it is essential that the Court's sentence "protect the public from further crimes of the defendant." As set forth above, the defendant is a self-admitted member of MS-13 and capable of extreme acts of violence, which makes him a greater risk of being a recidivist and committing further acts of violence in the future.

Finally, as to the defendant's argument that his incarceration during both the power loss in 2019 and the Covid pandemic warrants a reduced sentence, the Second Circuit recently noted, in affirming a sentence where the district court came "down from the high end to the low end [of the Guidelines range]," that it was "aware of no authority suggesting that a district court imposing a sentence is obligated to assign even [that] much weight, let alone more, to the harsh prison conditions brought on by the pandemic." United States v. Edwards, No. 21-1248, 2022 WL 1553455, at *2 (2d Cir. May 17, 2022) (holding that a sentence at low end of Guidelines range where court considered harsh conditions of confinement during pandemic, among other mitigating factors, was not substantially unreasonable). Here, any mitigating value considered by the Court based on the defendant's conditions of confinement is far outweighed by the other § 3553(a) factors in this case, including, without limitation, the horrific nature of the offense conduct, the need to protect the public from future crimes of the defendant and provide adequate punishment and deterrence for the defendant's crimes.

**III.     Conclusion**

        For the reasons set forth above, and in light of the § 3553(a) factors, the government respectfully submits that the Court should sentence the defendant to 33 years in prison.

Respectfully submitted,

BREON PEACE<br>
United States Attorney

By:   /s/ Paul G. Scotti  
       Paul G. Scotti  
       Justina L. Geraci  
       Megan E. Farrell  
       Assistant U.S. Attorneys  
       (631) 715-7836/7835/7862

cc:   Harvey Fishbein, Esq. (By ECF and E-mail)  
      Clerk of the Court (GRB)(By ECF)