JJD:MEF/PGS/JLG
F. # 2016R01021

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                                Docket No. 16-CR-403 (S-8)(GRB)

JAIRO SAENZ,

                   Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO JAIRO SAENZ'S
<u>MOTION TO SUPPRESS RESULTS OF TOWER DUMP ORDERS</u>

BREON PEACE
United States Attorney
Eastern District of New York
610 Federal Plaza
Central Islip, New York 11722

John J. Durham
Paul G. Scotti
Justina L. Geraci
Megan E. Farrell
Assistant U.S. Attorneys
    *(Of Counsel)*

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to the motion of defendant Jairo Saenz, also known as "Funny" (hereinafter "J. Saenz" or the "defendant"), filed on May 3, 20224 (ECF Dkt. No.'s 2540, 2540-1) (hereinafter, the "Motion"), seeking the suppression of the results of three cell tower orders, obtained pursuant to the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701 et seq., prior to the Supreme Court's decision in Carpenter v. United States, 138 S. Ct. 2206 (2018). The motion should be denied because the defendant has not established that he has standing to bring it and, regardless, law enforcement acted in good faith when it obtained the data pursuant to valid court orders that complied with then existing law.

RELEVANT BACKGROUND

A.    The Charges

On March 1, 2017, a grand jury sitting in this district returned a Second Superseding Indictment, captioned United States v. Edwin Amaya-Sanchez, et al., 16-CR-403 (S-2) (JFB) (ECF Dkt. No. 50), charging the defendant and twelve other members and associates of the MS-13 in 41 counts.  The defendant was charged in eight of those counts, and the charged crimes are described in detail in the government's detention letter, dated March 2, 2017 (ECF Dkt. No. 80), which includes, inter alia, the participants in the murders, and the defendant's role in the murders.  On March 2, 2017, the defendant was both arrested in connection with these charges.

Since his arrest seven years ago, additional charges have been levied against the defendant in subsequent superseding indictments.  The operable Eighth Superseding Indictment charges the defendant, and others, in 54 counts. J. Saenz is charged in 37 of these counts, for the period of January 1, 2008 through December 14, 2022, with inter alia racketeering, racketeering conspiracy, and a series of related violent acts, including murders, attempted murders, and an

2

arson, as well as narcotics trafficking.  A subsequent detention letter, detailing crimes with which the defendant is charged, was filed on June 7, 2018 (ECF Dkt. No. 458).

      B.    <u>The Offense Conduct</u>

      J. Saenz, and his co-defendant and brother Alexi Saenz, also known as "Plaky" and "Blasty" (hereinafter "A. Saenz") (together, the "defendants"), are alleged members and associates of the violent transnational criminal organization La Mara Salvatrucha, also known as the MS-13 (hereinafter the "MS-13").  More specifically, they are high-ranking members and leaders in the Sailors Locos Salvatruchas Westside ("Sailors") clique of the MS-13.  ECF Dkt. No. 80 at 2-3. They are alleged to have participated, and conspired to participate, in a broad set of crimes on behalf of and in furtherance of the MS-13.  Most relevant to the Motion are the September 13, 2016 murders of Kayla Cuevas and Nisa Mickens, the October 13, 2016 murder of Dewann Stacks, and the January 30, 2017 murder of Esteban Alvarado Bonilla.

      On the evening of September 13, 2016, members of the Sailors clique of the MS-13, including the defendants, drove around Brentwood in search of rival gang members to attack and kill.  The occupants of one car spotted 16-year-old Cuevas and 15-year-old Mickens, walking on Stahley Street in a residential neighborhood.  Recognizing Cuevas as a rival of the gang, they sought and obtained permission to kill them.  MS-13 members then chased and attacked both Cuevas and Mickens, wielding baseball bats and a machete, striking each of the victims numerous times in their heads and bodies, causing their deaths.  Mickens, whose body was discovered at approximately 8:36 p.m. on Stahley Street, near Broadway, in Brentwood, sustained significant sharp force trauma to her face and blunt force trauma to her head.  Cuevas, whose body was discovered the following day behind a house adjacent to where Mickens's body was found, sustained significant blunt force trauma to her head and body and multiple lacerations.

On October 13, 2016, the defendant, and several other MS-13 members and associates, were driving around the streets of Central Islip and Brentwood, in two separate vehicles, hunting for rival gang members to attack and kill.  The vehicle driven by J. Saenz pulled over to let three armed MS-13 members out, who brutally attacked Stacks with machetes and a baseball bat, at approximately 11:30 p.m., on the street in the vicinity of 231 American Boulevard in Brentwood, New York.  The members in the second vehicle, including A. Saenz, kept watch for the police.  Stacks sustained severe sharp and blunt force trauma to his face and head, rendering him nearly unrecognizable.

In the early morning hours of January 30, 2017, A. Saenz encountered 29-year-old Esteban Alvarado-Bonilla inside El Campesino Deli, located at 33 Caleb's Path in Central Islip, New York.  Believing that Alvarado-Bonilla was a member of the rival 18th Street gang, due to his donning a Peyton Manning jersey bearing the number "18," A. Saenz coordinated with other members of the Sailors clique, including J. Saenz.  The defendants later traveled to 41 Pilgrim Road, Brentwood, New York, where they picked up another co-conspirator.  Thereafter, there was a second meeting in the vicinity of Brightside Avenue and Carleton Avenue in Central Islip, New York.  The defendants, with other members and associates of the gang, orchestrated a plan to murder Alvarado-Bonilla, and assigned roles to other Sailors clique members and associates.  As planned, at approximately 10:30 a.m., three Sailors clique members drove back to the deli, where Alvarado-Bonilla was shot several times.  One of the bullets passed through his body, and struck a store clerk, who ultimately survived, in the chest.

C.    The Challenged Cell Tower Orders

Pursuant to Title 18, United States Code, Section 2703(d)—a section of the Stored Communications Act ("SCA")—three orders, as described in more detail below (together, the

"SCA Orders"), which now are being challenged by the defendant, were issued by Magistrate Judges in this District.

First, on September 28, 2016, the Honorable Kathleen Tomlinson, United States Magistrate Judge, Eastern District of New York, issued an order directing cellphone service providers to provide historical cell tower log information, that is, information from specific cellular towers near the area of Stahley Street and Broadway in Brentwood, New York, for the period of 7:00 p.m. through 9:00 p.m. on September 13, 2016 (the "September 28 Order").  Ex. 1 to J. Saenz Mot. at 00001966-00001969. The September 28 Order was issued upon the application (the "September 28 Application"), signed by Eastern District of New York Assistant United States Attorney John J. Durham, which set forth specific and articulable facts explaining how the cell-tower information sought for the designated location and period "was relevant and material to an ongoing criminal investigation," 18 U.S.C. § 2703(d), namely that it was expected to yield evidence "relevant and material to the federal investigation into the murders of Mickens and Cuevas because the records will enable the government to determine whether any wireless devices used by members and associates of the MS-13 were in the area of Stahley Street and Broadway during the approximate time of the murders." Id. at 028598-028604.

Second, on November 7, 2016, the Honorable Steven I. Locke, United States Magistrate Judge, Eastern District of New York, issued an order directing cellphone service providers to provide historical cell tower log information, that is, information from specific cellular towers near the area of 231 American Boulevard in Brentwood, New York, for the period of 10:30 p.m. on October 13, 2016 through 12:30 a.m., on October 14, 2016 (the "November 7 Order"). Ex. 2 to J. Saenz Mot. at 00015028-00015030.   The November 7 Order was issued upon the application (the "November 7 Application"), signed by Eastern District of New York Assistant

United States Attorney John J. Durham, which set forth specific and articulable facts explaining how the cell-tower information sought for the designated time period "was relevant and material to an ongoing criminal investigation," 18 U.S.C. § 2703(d), namely that it was expected to yield evidence "relevant and material to the federal investigation into the murder of Stacks because the records will enable the government to determine whether any wireless devices used by members and associates of the MS-13 were in the area of American Boulevard in Brentwood during the approximate time of the murder." Id. at 028607.

        Third, on February 3, 2017, the Honorable Anne Y. Shields, United States Magistrate Judge, Eastern District of New York, issued an order directing cellphone service providers to provide historical cell tower log information, that is, information from specific cellular towers near the areas of (1) 41 Pilgrim Road in Brentwood, New York, for the period of 7:30 a.m. through 9:30 a.m. on January 30, 2017; (2) Brightside Avenue and Carleton Avenue in Central Islip, New York, for the period of 9:00 a.m. through 11:00 a.m. on January 30, 2017; and (3) 133 Caleb's Path in Central Islip, New York, for the period of 9:00 a.m. through 11:00 a.m. (the "February 3 Order"). Ex. 3 to J. Saenz Mot. at 00003528-00003531.  The February 3 Order was issued upon the application (the "February 3 Application"), signed by Eastern District of New York Assistant United States Attorney John J. Durham, which set forth specific and articulable facts explaining how the cell-tower information sought for the designated time period "was relevant and material to an ongoing criminal investigation," 18 U.S.C. § 2703(d), namely that it was expected to yield evidence "relevant and material to the federal investigation into the murder of Alvarado-Bonilla because the records will enable the government to determine whether any wireless devices used by members and associates of the MS-13 were in the areas of 41 Pilgrim, Brightside/Carleton and/or the Deli in Central Islip/Brentwood before, during and after the

Alvarado-Bonilla murder." Id. at pg. 10. Moreover, the February 3 Application explained the significance of each of these three locations, namely that 41 Pilgrim was where one of the participants in the murder had been picked up, that the area of Brightside/Carlton is the location where the participants met to plan to the murder, and 133 Caleb's Path is location of the deli where the murder occurred. Id. at pgs. 7-9.

The records and information requested in the September 28 Application, the November 7 Application, and the February 3 Application (together, the "Cell Tower Applications") included the telephone call numbers and unique identifiers for each wireless device in the vicinity of the relevant tower; the source and destination phone numbers associated with each communication; the date, time and duration of each communication; the "sectors" that received a radio signal from each locally served wireless device; and the type of communication transmitted through the tower. Ex. 1 to J. Saenz Mot. at 00001967-00001968; Ex. 2 to J. Saenz Mot. at 00015030; and Ex. 3 to J. Saenz Mot. at 00003530-00003531. Thus, the information produced in response to the SCA Orders constitutes cell-site location information ("CSLI") for the various phones that connected to the particular towers during the discrete periods requested.

ARGUMENT

I.    The Court Should Not Suppress the Information Obtained Pursuant to the SCA Orders
      Under Carpenter v. United States

The Court should not suppress the information obtained pursuant to the SCA Orders because they were properly issued under, and in compliance with, a duly enacted statute and then binding precent, prior to the Supreme Court's decision in Carpenter. Moreover, based on well-established case law in the Second Circuit, the good faith exception applies, and as a result, federal officials were permitted to reasonably rely on the SCA and the third-party doctrine to conclude that the requested cell-site information—which was for brief intervals on discrete days in specific

locations—could be obtained without a warrant.  In any event, because the defendant failed to submit an affidavit demonstrating sufficient facts to show that he had a legally cognizable privacy interest in the searched premises at the time of the search, he lacks standing to challenge the SCA orders.

      A.    <u>Applicable Law</u>

        1.    <u>The Stored Communications Act</u>

The Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701 <u>et</u> <u>seq</u>., provides that "[a] governmental entity may require a provider of electronic communication service . . . to disclose a record or other information pertaining to a subscriber or customer of such service (not including the contents of communications)" if the entity obtains a warrant, obtains a court order, has the consent of the subscriber or customer, or if certain other specific conditions are satisfied. 18 U.S.C. § 2703(c).  According to Section 2703(d), to obtain a court order, the governmental entity must "offer[] specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d).

Accordingly, pursuant to § 2703(d), law enforcement was permitted to acquire cell tower information by making the "reasonable grounds" showing set forth in subsection (d) of the provision, rather than the higher "probable cause" showing required for a warrant under subsection (c)(1)(A) of the statute.  <u>See</u> <u>United States v. Herron</u>, 2 F. Supp. 3d 391, 401 (E.D.N.Y. 2014) ("This [reasonable grounds] showing is lower than the probable cause standard required for a search warrant.").

As of February 2017, every circuit to have considered whether an order issued under Section 2703(d) was a constitutionally acceptable basis for obtaining historical cell site data had concluded that such orders were, in fact, sufficient.  <u>See</u> <u>United States v. Thompson</u>, 866 F.

3d 1149, 1158 (10th Cir. 2017) (issuing decision after certiorari was granted in Carpenter and holding, in agreement with all other circuits that CSLI was governed by the third-party doctrine under applicable Supreme Court precedents and hence implicated no privacy interests under the Fourth Amendment, and collecting cases); United States v. Graham, 824 F.3d 421, 424-26 (4th Cir. 2016) (en banc); United States v. Carpenter, 819 F.3d 880, 887, 890 (6th Cir. 2016), rev'd, 132 S. Ct. 2206 (2018); United States v. Davis, 785 F.3d 498, 511-13 (11th Cir. 2015) (en banc), cert. denied, 136 S. Ct. 479 (2015); In re Application, 724 F.3d 600, 614-15 (5th Cir. 2013); United States v. Guerrero, 768 F.3d 351, 358-59 (5th Cir. 2014); In re Application, 620 F.3d 304, 313 (3d Cir. 2010). See also United States v. Siri-Reynoso, 21 CV 11009 (CM), S6 17 Cr. 418 (CM), 2023 WL 22626, *9 (S.D.N.Y. Jan. 3, 2023) ("For years, the plain text of the Stored Communications Act authorized the Government and law enforcement to obtain historical cell-site data by getting a court order upon a showing that there were reasonable grounds to believe the information sought was relevant and material to an ongoing criminal investigation.")

    2.  Carpenter v. United States

        On June 22, 2018, the Supreme Court held in Carpenter that for law enforcement to obtain an individual's historical cell-site records, for periods of seven days or greater, they "must generally obtain a warrant supported by probable cause before acquiring such records," as a cell phone user "maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI."  585 U.S. at 2217, 2221.  Nonetheless, the Supreme Court acknowledged that it had "previously held that 'a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties,'" Carpenter, 138 S. Ct. at 2216 (quoting Smith, 442 U.S. at 743-44), and that cell site records "implicate[] [that] third-party principle" because "the individual continuously reveals his location to his wireless carrier," id. at 2216.  The Court reasoned, however, that cell site records were a "novel" category because they contained

9

"detailed, encyclopedic, and effortlessly compiled" information regarding an individual's physical movements. Id. at 2216-17.

Moreover, the Supreme Court declined to rule on whether "tower dumps" require a warrant. Id. at 2220 ("We do not express a view on matters not before us: real-time CSLI or "tower dumps" (a download of information on all the devices that connected to a particular cell site during a particular interval)."). Likewise, the Supreme Court declined to rule whether less than seven days of CSLI required a search warrant. See id. at 2217, n. 3 ("[W]e need not decide whether there is a limited period for which the Government may obtain an individual's historical CSLI free from Fourth Amendment scrutiny, and if so, how long that period might be. It is sufficient for our purposes today to hold that accessing seven days of CSLI constitutes a Fourth Amendment search.").

### 3.   The Good Faith Exception

"To safeguard Fourth Amendment rights generally, the Supreme Court has crafted the exclusionary rule, requiring the exclusion of evidence when the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." United States v. Stokes, 733 F.3d 438, 443 (2d Cir. 2013) (internal citations and quotations omitted). As the rule seeks "to deter future Fourth Amendment violations," Davis v. United States, 564 U.S. 229, 236-37 (2011), the Supreme Court advises district courts to only suppress evidence where it serves such a purpose. See Herring v. United States, 555 U.S. 135, 141 (2009). Because "[t]he rule's costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application," id., the Supreme Court has explained that "[s]uppression of evidence, however, has always been [a] last resort, not [its] first impulse." Hudson v. Michigan, 547 U.S. 586, 591 (2006).

Under the "good faith" exception, however, when law enforcement acts with "an objectively reasonable good-faith belief that their conduct is lawful," exclusion simply "cannot

pay its way," and the exclusionary rule does not apply. <u>Davis</u>, 564 U.S. 229 at 238 (internal quotation marks omitted). The good faith exception thus recognizes that "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope . . . there is no police illegality and thus nothing to deter." <u>United States v. Leon</u>, 468 U.S. at 920-21. The corrective value of excluding evidence only "justifies its cost when the police 'exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights.'" <u>United States v. Raymonda</u>, 780 F.3d 105, 117 (2d Cir. 2015) (quoting <u>Stokes</u>, 733 F.3d at 443). Because the suppression of evidence "exacts a heavy toll on the justice system . . . the exclusionary rule does not apply whenever suppressing evidence 'might provide marginal deterrence.'" <u>Id.</u> (quoting <u>Herring</u>, 555 U.S. at 141 (internal quotation marks omitted)).

Significantly, the good faith exception is not limited to circumstances involving reliance on a warrant obtained based on a finding of probable cause by a judge or magistrate. The Supreme Court has ruled squarely that an officer's reasonable reliance on a statute—even where a court concludes in hindsight that the statute is constitutionally infirm—bars application of the exclusionary rule. In <u>Krull</u>, 480 U.S. 340 (1987), the Supreme Court emphasized that "'[p]enalizing the officer for the [legislature's] error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.'" <u>Id.</u> at 350 (quoting <u>Leon</u>, 468 U.S. at 921). Such reliance on a duly enacted statute is unreasonable only "if, in passing the statute, the legislature wholly abandoned its responsibility to enact constitutional laws." <u>Id.</u> at 355. Absent the patent unconstitutionality of a statute, an officer's good-faith reliance on that statute may not be penalized through suppression of evidence.

Similarly, "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." <u>Davis v. United States</u>, 564 U.S.

229, 241 (2011).  Indeed, the Supreme Court has recognized that an officer who conducts a search in reliance on binding appellate precedent "ac[ts] as a reasonable officer would and should act under the circumstances," and that the effect of excluding evidence obtained from such a search "can only be to discourage the officer from doing his duty."  Id. (internal quotation marks omitted) (quoting Leon 468 U.S. at 920.).  In United States v. Aguiar, the Second Circuit similarly concluded that "binding appellate precedent" within the meaning of Davis includes "the precedent of this Circuit and the Supreme Court."  737 F.3d 251, 261 (2d Cir. 2013) (declining to suppress evidence obtained through the the warrantless use of a GPS tracking device on a defendant's vehicle, which had occurred prior to United States v. Jones, 565 U.S. 400, 404 (2012)).

Consistent with this principle, the Second Circuit has repeatedly found that, where law enforcement obtained CSLI pursuant to process issued under the SCA prior to Carpenter, under the good faith exception, a defendant is not entitled to have the records suppressed.  See United States v. Canada, 858 F. App'x 436, 439-440 (2d Cir. 2021) (summary order) (declining to exclude cell site evidence obtained pursuant to a court order issued under the SCA before the Supreme Court decided Carpenter); United States v. Felder, 993 F.3d 57, 75 (2d. Cir. 2021), cert. denied, 142 S. Ct. 597 (2021) (holding that district court did not err in finding good faith exception applied to "historical [CSLI] obtained pursuant to a court order supported by less than probable cause"); United States v. Miller, 807 F. App'x 90 (2d Cir. 2020) (summary order) (affirming conviction and finding that three days of defendant's CSLI did not need to be suppressed because it was obtained by order under the SCA prior to Carpenter and good faith exception applied); United States v. Herron, 762 F. App'x 25, 31 (2d Cir. 2019) (summary order) (affirming district court's rejection of defendant's motion to suppress "43 days of cell-site records" that were obtained pursuant to an order issued under 18 U.S.C. § 2703 and finding that the good faith

exception applied); United States v. Chambers, 751 F. App'x 44, 46-47 (2d Cir. 2018) (summary order) (concluding that good faith exception applied to CSLI of defendant, obtained pre-Carpenter, pursuant to order under SCA); United States v. Zodhiates, 901 F.3d 137, 143-144 (2d Cir. 2018) (holding that the good faith exception applies to cell-site location information obtained in 2011, pursuant to a subpoena issued under § 2703(c) of the SCA, because the search was made in "objectively reasonable reliance on appellate precedent existing at the time of the search").  And lower courts within the Second Circuit have "uniformly followed suit, finding that cell site data obtained without a warrant—either through an SCA order or subpoena—falls within the good faith exception."   United States v. Tartaglione, No. 16-CR-832 (KMK), 2023 WL 2237903, *12 (S.D.N.Y Feb. 27, 2023) (denying motion to suppress CSLI obtained pursuant to SCA as part of tower dump and collecting district court cases in Second Circuit); United States v. Todaro, 16-CR-347-2 (RJD), 2020 WL 6565129, * (E.D.N.Y. Nov. 9, 2020) (denying motion to suppress CSLI obtained pursuant to order issued under § 2703(d), prior to Carpenter, and finding that good-faith exception to warrant requirement applied).

       As the Second Circuit has explained, before Carpenter, "all five courts of appeals to have considered the question relied on [the third-party] doctrine in holding that government acquisition of historical cell-site location information from third parties was not subject to the Fourth Amendment's warrant requirement."  Felder, 993 F.3rd at 75-76 (collecting cases) ("It was on that very basis that this court, in Zodhiates [citation omitted], recognized a good-faith exception to suppression of cell phone records obtained without a warrant pre-Carpenter but pursuant to a subpoena then authorized by the Stored Communications Act."); cf. United States v. Walsh, 774 F. App'x 706, 707-08 (2d Cir. 2019) (summary order) (concluding that defendant's ineffective assistance claim failed when it was based on counsel's failure to challenge the pre-Carpenter

warrantless acquisition of CSLI, since in <u>Zhodiates</u> the Court concluded, based on pre-<u>Carpenter</u> precedent, a reasonable officer "could have reasonably and in good faith believed that CSLI collection pursuant to 18 U.S.C. §§ 2703(c)(1)(B) and (d) did not require a warrant").

Indeed, this same approach has been adopted by each of the circuits that have considered <u>Carpenter</u> as applied to CSLI obtained prior to the decision in Carpenter.  <u>See</u>, <u>e.g.</u>, <u>United States v. Joyner</u>, 899 F.3d 1199, 1205 (11th Cir. 2018) ("[T]he Government complied with the requirements of the SCA in obtaining the orders to compel cell site records, and when they did so in June 2015, that warrantless procedure was, under this Court's precedent, within the bounds of the Fourth Amendment."); <u>United States v. Chavez</u>, 894 F.3d 593,  608 (4th Cir. 2018) ("While Carpenter is obviously controlling going forward, it can have no effect on . . . case[s where] . . . investigators . . . reasonably relied on court orders and the Stored Communications Act in obtaining the cell site records."); <u>United States v. Curtis</u>, 901 F.3d 846, 849 (7th Cir. 2018) ("We conclude, therefore, that even though it is now established that the Fourth Amendment requires a warrant for the type of cell-phone data present here, exclusion of that information was not required because it was collected in good faith.").  Indeed, in <u>Tartaglione</u>, the court observed that it was not aware of, and the defendant did not cite, "any federal case in which the court did not apply the good faith exception to historical CSLI obtained pursuant to the SCA prior to the <u>Carpenter</u> decision."  2023 WL 2237903 at *12.  Likewise, the defendant here has failed to identify a single case with such a result.

    4.  <u>Standing</u>

"Fourth Amendment rights are personal rights . . . [that] may not be vicariously asserted."  <u>United States v. Haqq</u>, 278 F.3d 44, 47 (2d Cir. 2002) (quoting <u>Rakas v. Illinois</u>, 439 U.S. 128, 133-34 (1978)).  "In order to prevail on a contention that a search violated the Fourth Amendment, an accused must show that he had a legitimate expectation of privacy in a searched

place or item." United States v. Rahme, 813 F.2d 31, 34 (2d Cir. 1987) (citing Rawlings v. Kentucky, 448 U.S. 98, 104 (1980)).  In other words, "a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that his Fourth Amendment rights were violated by the challenged search or seizure." United States v. Padilla, 508 U.S. 77, 81 (1993) (per curiam) (emphasis in original).

"When considering a claimed violation of Fourth Amendment rights, the burden is on the defendant to establish that his own rights under the Fourth Amendment were violated." United States v. Paulino, 850 F.2d 93, 96 (2d Cir. 1988); see also United States v. Osorio, 949 F.2d 38, 40 (2d Cir. 1991).  To satisfy this burden, "a defendant must submit an affidavit from someone with personal knowledge demonstrating sufficient facts to show that he had a legally cognizable privacy interest in the searched premises at the time of the search." United States v. Ruggiero, 824 F. Supp. 379, 391 (S.D.N.Y. 1993), aff'd, 44 F.3d 1102 (2d Cir. 1995) (citing Rawlings v. Kentucky, 448 U.S. 98 (1980)); see also Rakas, 439 U.S. at 130 n.1.  The fact that the government connects a defendant to the subject of a search does not suffice to establish standing, absent an affidavit from someone with personal knowledge of the facts therein, which affidavit would establish standing on its own.  See United States v. Watson, 404 F.3d 163, 166 (2d Cir. 2005) ("[The] defendant could not challenge the search of a residence merely because he anticipated that the Government will link the objects recovered in that search to defendant at trial.").

B.     Discussion

1.     The Defendant Has Failed to Establish That He Has Standing

The defendant has not established that he has standing to challenge the SCA Orders because he has not submitted an affidavit from someone with personal knowledge establishing a privacy interest in any of the cellular telephones for which the government obtained information

pursuant to the SCA Orders.  Indeed, he has not specified any phone numbers affected by the SCA Orders to which he claims any privacy interest.  The defendant's decision is possibly a tactical one: because of the incriminating nature of the historical cell tower and historical cell site data in this case, submission of an affidavit would effectively restrict the defendant's ability to pursue a theory at trial contrary to that contained in his affidavit.  See, e.g., United States v. Montoya-Eschevarria, 892 F. Supp. 104, 106 n.2 (S.D.N.Y. 1995) (noting, in finding that defendant failed to establish standing to attack Title III wiretap interception because he did not submit affidavit averring that his voice was intercepted, that "[d]efendant's reluctance to testify to the presence of his voice on the surveillance tapes is understandable [because] prior inconsistent suppression hearing testimony may be used to impeach the defendant during trial"); see also United States v. Jaswal, 47 F.3d 539, 543 (2d Cir. 1995) ("Prior inconsistent suppression hearing testimony may properly be used to impeach a defendant during trial.").  Similarly, unsworn assertions of counsel like those made here (J. Saenz Mot. at 1, 17), when counsel does not have personal knowledge regarding the user of telephone numbers reflected in the data obtained, are insufficient.  See United States v. Brown, 627 F.Supp.3d 206, (E.D.N.Y. 2022) (denying motions to suppress GPS evidence obtained from rental cars only as to defendants that failed to submit sworn affidavits establishing that "they had a Fourth Amendment interest in the data they seek to suppress"); Tartaglione, 2023 WL 2237903 at *10-11 (finding that defendant did not have standing where he submitted unsigned declaration alleging personal interest in phone numbers apparent from tower dump records); United States v. Nelson, 20 Crim. 353 (BMC) (VMS), 2022 WL 18636591, *5 (E.D.N.Y. Oct. 4, 2022) (Report and Recommendation) (collecting cases regarding the need for a defendant asserting a Carpenter claim concerning CSLI to submit a sworn statement to establish a reasonable expectation of privacy), adopted, 2023 WL 358421, *1 n.1 (E.D.N.Y. Jan. 23, 2023).

Although the government will argue at trial that certain of the phone numbers reflected in the data obtained pursuant to the SCA Orders belong to the defendant, that does not suffice to give the defendant standing.  A defendant does not have standing to challenge a search "merely because he anticipate[s] that the Government will link the objects recovered in that search" to him "at trial." Watson, 404 F.3d at 166.  Courts routinely reject efforts by defendants to establish standing in this fashion.  See, e.g., Brown, 627 F. Supp. 3d at 219 (quoting Montoya-Eschevarria, 892 F. Supp. at 106) (observing that "unsworn assertion of the Government's representations does not meet this burden"); United States v. Loera, 333 F. Supp. 3d 172, 179 (E.D.N.Y. 2018) (finding that defendant did not have standing to suppress information recovered from foreign computer servers where he relied on government agent's affidavit instead of his own).  In fact, the Second Circuit and district courts addressing this precise issue as it relates to historical cell site information have held that standing must be established by the defendant himself.  See, e.g., United States v. Dore, 586 F. App'x 42, 46 (2d Cir. 2014); United States v. Pizarro, 17 Cr. 151 (AJN), 2018 WL 1737236, at *7 (S.D.N.Y. Apr. 10, 2018) (denying motion to suppress historical cell site data because "[d]efendants have not submitted an affidavit demonstrating their privacy interest in the subject numbers" whose data was seized); United States v. Walker, 16 Cr. 567 (JSR), ECF Dkt. No. 56, Mem. Op. at 3-4 (S.D.N.Y. Mar. 8, 2017) (holding that a defendant seeking to assert that he has a protectable privacy interest in cell site location information "must demonstrate that he owned or had exclusive use of the cell phone during the period in question," and finding that a defendant lacked standing because "[a]t most, the defendant has demonstrated non-exclusive and sporadic use").  Although the government expects to connect certain cellphone numbers to the defendant at trial, that fact alone cannot establish his standing to bring the instant suppression motion.  Accordingly, the defendant's motion must be denied on this ground alone.

2.      The Good Faith Exception Applies

Even if the defendant were able to establish standing to bring the pending suppression motion, his motion should nevertheless be denied because law enforcement acted in good faith when obtaining the challenged records in 2016 and 2017.  Specifically, the Supreme Court's prior decisions regarding the third-party doctrine, the unanimity of circuits to consider the validity of 2703(d) orders, and the indication of the Second Circuit in a summary order all supported law enforcement's good faith belief that the SCA Orders were lawful.  Indeed, post-Carpenter decisions have uniformly concluded that similar historical cell site records seized pursuant to 2703(d) orders were obtained in good faith, rendering the exclusionary rule inapplicable.

As discussed above, prior to Carpenter, every circuit to have considered whether an order issued under Section 2703(d) was a constitutionally acceptable basis for obtaining historical cell site data concluded that such orders were, in fact, sufficient.  Although the Second Circuit had not directly opined on the issue of whether an individual had a reasonable expectation of privacy in historical cell site information, before Carpenter, the Second Circuit had strongly indicated that no such expectation of privacy existed.  Specifically, in United States v. Pascual, 502 F. App'x 75, 80 (2d Cir. 2012), the Second Circuit had stated that "no governing precedent from this Court or the Supreme Court required exclusion" of historical cell site information obtained without a warrant or a showing of probable cause.  And in fact, the Second Circuit went on to note that "the general principles adopted by those courts point[] the other way"—i.e., toward the sufficiency of a Section 2703(d) order and against the idea of requiring a warrant or probable cause to obtain historical cell site records.  Id.

Indeed, the relevant Supreme Court precedent at the time the historical cell site information was obtained in this case provided a clear basis for a reasonable law enforcement officer to conclude that obtaining those records from a cellular service provider was not a search because that data had been shared with a third party. In United States v. Miller, 425 U.S. 435, 443 (1976), the Supreme Court had established that "the Fourth Amendment d[id] not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities[.]" And in Smith v. Maryland, 442 U.S. 735, 744 (1979), the Supreme Court had specifically addressed the issue in the context of records maintained by telephone companies, and concluded that an individual had no reasonable expectation of privacy in dialed telephone numbers conveyed to the telephone company.

Based on the above precedent, law enforcement here had every reason to believe that they were acting lawfully when they obtained historical cell tower information and historical cell site information—which had been revealed to and collected by third-party cellular service providers—pursuant to the SCA Orders. The objective reasonableness of that belief, and law enforcement's good faith, is further demonstrated by the opinions of every circuit to consider the issue, which, at that time, had held that a warrant was not required to obtain historical cell site information. See Graham, 824 F.3d at 424-26; Carpenter, 819 F.3d at 887, 890; Davis, 785 F.3d at 511-13; In re Application, 724 F.3d at 614-15; Guerrero, 768 F.3d at 358-59; In re Application, 620 F.3d at 313.

Furthermore, law enforcement's objective good faith belief that it could acquire the historical cell site data without a warrant was not based solely on then-existing precedent. That belief was reinforced by Congress's then-valid judgment as to the proper procedure for obtaining such records, as embodied by the SCA. "Objectively reasonable good faith includes 'searches

conducted in reasonable reliance on subsequently invalidated statutes.'" Chavez, 894 F.3d at 608 (quoting Davis, 564 U.S. at 239); see also Felder, 993 F.3d at 75.  Here, the orders obtained by the government fully conformed to the requirements of the SCA, and the defense does not dispute that the government's applications satisfied the factual threshold of "reasonable grounds to believe" that the records sought would be "relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d).  Similarly, Judge Tomlinson, Judge Locke and Judge Shields acted reasonably and lawfully in compliance with the SCA when they issued the orders authorizing the collection of this evidence, and law enforcement thus acted reasonably and in good faith when it executed those orders.  See Felder, 993 F.3d at 75.

Moreover, since Carpenter was decided, every circuit court to address this issue, including the Second Circuit, has held that the good faith exception applies to historical cell site location information obtained via the SCA pre-Carpenter.  See Felder, 993 F.3d at 75-76 (noting the precedential authority of opinion holding that where cell-site records were obtained under the SCA's order requirement rather than its lesser subpoena requirement, prior to Carpenter, the good-faith exception to suppression of cell phone records applies); Chavez, 894 F.3d at 608 (holding that Carpenter "can have no effect on" cases where law enforcement acted in "[o]bjectively reasonable good faith," including "searches conducted in reasonable reliance on subsequently invalidated statutes") (internal quotation marks omitted) (quoting Leon, 468 U.S. at 239); United States v. Joyner, 899 F.3d 1199, 1205 (11th Cir. 2018) (affirming district court's decision to deny motion to suppress cell site evidence, and noting that "the fact that the Carpenter Court agreed with [the defendant's] Fourth Amendment theory does not affect the applicability of the Leon good faith exception in this case. . . . Here, the Government complied with the requirements of the SCA in obtaining the orders to compel cell site records, and when they did so

in June 2015, that warrantless procedure was, under this Court's precedent, within the bounds of the Fourth Amendment."); United States v. Curtis, 901 F.3d 846, 849 (7th Cir. 2018) ("[E]ven though it is now established that the Fourth Amendment requires a warrant for the type of cell-phone data present here [seized pursuant to 2703(d)], exclusion of that information was not required because it was collected in good faith."); United States v. Carpenter, 926 F.3d 313, 317-18 (6th Cir. 2019) (concluding that "it was not unreasonable for the FBI agents who acquired [defendant's cell site data] to rely on § 2703(d)," and suppression was therefore unwarranted "because the FBI agents relied in good faith on the SCA when they obtained the data"); United States v. Goldstein, 914 F.3d 200, 204 (3d Cir. 2019) ("The good faith exception applies to the government's search in this case because the government acted upon an objectively reasonable, good faith belief that obtaining [the defendant's cell site data] under Section 2703(d) was legal."); United States v. Korte, 918 F.3d 750, 758 (9th Cir. 2019) ("Because we find the Government reasonably relied on the SCA when it obtained [the defendant's cell site data], we affirm the district court's application of the Fourth Amendment's good-faith exception."); United States v. Ackies, 918 F.3d 190, 202-03 (1st Cir. 2019).

To the extent J. Saenz suggests that the search here is more invasive—because the CSLI obtained was pursuant to a SCA order for tower information during discrete intervals at specific locations—and thus that neither Carpenter nor Felder is binding (J. Saenz Mot. at 20), he is profoundly mistaken. Primarily, the holding in Carpenter is explicitly narrow, in the that the Supreme Court specifically declined to conclude that obtaining tower dumps, particularly for periods less than 7 days, required a warrant supported by probably cause. Carpenter, 585 S.Ct. at 2220; see also United States v. Adkinson, 916 F.3d 605, 611 (7th Cir. 2019) (reasoning that Carpenter "did not invalidate warrantless tower dumps ... which identified phones near one

location ... at one time"); United States v. Green, 981 F.3d 945, 958 (11th Cir. 2020) (noting question unresolved by Supreme Court of "whether acquiring [real-time tracking data] constitutes a search"); United States v. Trader, 981 F.3d 961, 968 (11th Cir. 2020) (noting Supreme Court's unresolved questions include whether "the government [can] collect cell-site location information in real time or through 'tower dumps' not focused on a single suspect" without a warrant).

Secondly, courts that have analyzed this very issue have found that tower dump data—which pertains to discrete intervals at specific locations—does not raise the same privacy concerns as longer-term tracking of a particular individual's movement through their cellular telephone. See Matter of Search of Info. Associated with Cellular Tel. Towers Providing Serv. to [Redacted] Stored at Premises Controlled by Verizon Wireless, 616 F. Supp. 3d 1, 7–8 (D.D.C. 2022) (citing Carpenter, 138 S.Ct. at 2217) ("To be sure, such tower dumps do not implicate the significant privacy interests in the form of a "comprehensive record" over a lengthy time period of a targeted individual's movements that animated the Carpenter Court's holding."); United States v. Walker, 2:18-CR-37-FL-1, 2020 WL 4065980, * (E.D.N.C. July 20, 2020) (holding that, even post-Carpenter, a search warrant is not required to obtain CSLI for four 60 to 90-minute time periods over the course of two days, and "no basis for attaching a Fourth Amendment interest to tower dump CLSI [sic]" because such dumps only "capture CLSI [sic] for a particular place at a limited time" and therefore "the privacy concerns underpinning the court's holding in Carpenter do not come into play"). Relatedly, district courts in this circuit have already found, and agreed, that the good-faith exception applies to tower dump data obtained pursuant to the SCA prior to Carpenter. See Tartaglione, 2023 WL 2237903 at *12-13 (denying suppression of tower dump data obtained, pre-Carpenter, pursuant to an order under the SCA, based on the good-faith exception); United States v. Wilson, 10-cr-622 (ADS), 2018 WL 4623017 (E.D.N.Y. Sept. 26,

2018) (denying claim of ineffective assistance of counsel where defense attorney failed to move to suppress CSLI obtained pursuant to order under SCA seeking tower data near location of crime during discrete window, prior to <u>Carpenter</u>, because good faith exception would have applied).

Indeed, the decisions of these courts are consistent with <u>Felder</u>, which is binding here even if the facts are not identical, and in which the Second Circuit unequivocally held that, prior to <u>Carpenter</u>, "federal officials could have reasonably relied on [the SCA] and the third-party doctrine to conclude that the requested historical cell-site information could be obtained without a warrant supported by probable cause." 993 F.3d at 76-77.  Finally, and importantly, the defendant still does not have standing in this matter, as discussed above in Section I.B.1.  To conclude that he can assert the rights of others when he has not even established standing to assert his own rights is wholly unsupported by law.  <u>See</u> <u>Paulino</u>, 850 F.2d at 96 (citing <u>Rakas</u>, 439 U.S. 128, 134, 138–39 (1978)) ("When considering a claimed violation of Fourth Amendment rights, the burden is on the defendant to establish that his own rights under the Fourth Amendment were violated.")

The same logic applies here.  As the above makes clear, under these circumstances—where the law enforcement agents relied in good faith on the SCA, judicial precedent regarding the third-party doctrine, and on Judge Tomlinson, Locke and Shields' orders—there can be no serious question that the agents acted in good faith and in compliance with then-existing law.  Thus, no exclusionary remedy is appropriate; the deterrent benefit of suppressing the historical cell site data obtained under the SCA is inapplicable.  "[T]he harsh sanction of exclusion should not be applied to deter [this] objectively reasonable law enforcement activity." <u>Davis</u>, 564 U.S. at 241 (citation and quotation marks omitted).

CONCLUSION

For the foregoing reasons, the government respectfully submits that the defendant's motion should be denied in its entirety.

Dated:    Central Islip, New York
           June 3, 2024

                            BREON PEACE
                            United States Attorney
                            Eastern District of New York
                            610 Federal Plaza
                            Central Islip, New York 11722

By:   /s/ Megan E. Farrell
        John J. Durham
        Paul G. Scotti
        Justina L. Geraci
        Megan E. Farrell
        Assistant United States Attorneys
        (631) 715-7900